RENDERED: APRIL 30, 2020
TO BE PUBLISHED

## Supreme Court of Kentucky

2019-SC-000113-MR

DATE 6/22/20

NATHANIEL L. BREAZEALE                                    APPELLANT

ON APPEAL FROM TRIGG CIRCUIT COURT
V.          HONORABLE CLARENCE A. WOODALL, III, JUDGE
NO. 17-CR-00039

COMMONWEALTH OF KENTUCKY                              APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**
**AFFIRMING**

Nathaniel Breazeale was convicted of one count of first-degree assault and one count of first-degree criminal abuse. He was thereafter sentenced to thirty years and now appeals his convictions to this Court. After review, we affirm.

## I.    FACTUAL BACKGROUND

Breazeale began living with his girlfriend Samantha[1] in late December 2016. Samantha's then-one-year-old son Charlie, who is not Breazeale's biological child, is the victim in this case.

During March of 2017 when the crimes in this case occurred, both Breazeale and Samantha worked during the day. Normally, Samantha's sister would babysit Charlie while she and Breazeale were at work. However, on March 14th Breazeale called in sick from work. Both he and Charlie had strep

---

[1] Because of the nature of the facts in this case, those involved will be referred to by pseudonym.

throat, and both were vomiting frequently. Therefore, Breazeale babysat Charlie that day while Samantha was at work.

Samantha testified she left for work early that morning, and there was nothing wrong with Charlie when she left. There was uncontroverted evidence, including Breazeale's own statement to police, that Breazeale was the only person in the home with Charlie that day. When Samantha arrived home at 4:30 that evening, Breazeale and Charlie were asleep on the couch. Rather than waking them she made herself some food and watched a movie. About two hours later she decided to take Charlie with her to bed. When she picked him up, she noticed a bruise over his eye. She woke Breazeale and asked what happened. He told her that Charlie slipped in his footie pajamas on the tile floor in the home and hit his head. Apparently satisfied with this answer, Samantha continued getting herself and Charlie ready for bed. She felt through his clothes to see if Charlie's diaper was wet, it was not. So Samantha put Charlie in the pack-n-play he slept in. Samantha, Charlie, and Breazeale then slept through the night.

Samantha woke up for work at 6:15 the next morning but decided to call in sick. She believed she was also coming down with strep throat. Breazeale called in sick again as well, and they went back to sleep. Around 9 am Samantha heard Charlie moving around in his pack-n-play, so she got him out to change his diaper. When she removed Charlie's clothing, she saw bruises all over his body. When asked what happened, Breazeale said while he was babysitting the day before he was holding Charlie in one arm and his pack-n-play in the other while trying to move the pack-n-play from the master bedroom to the living room. He told her he tripped and landed on Charlie in

the process. Breazeale would later tell police the same story but said that he held Charlie out to the side when he fell and did not land on him.

Samantha stated that she wanted to take Charlie to the hospital as soon as Breazeale told her this. Breazeale would not allow it, as he believed he would be arrested for child abuse if they took Charlie to the hospital. Samantha said he took the keys to the only vehicle at the home and her cell phone, and they argued about going to the hospital for about fifteen minutes. Eventually Breazeale threw her phone at her and left.

Samantha then called her mother instead of 911.[2] Samantha's mother picked Samantha and Charlie up and took them to her home about a mile away. Almost immediately after they arrived Charlie began spitting up blood. They then took him to the Trigg County Hospital Emergency Room.

Dr. Jefferey Frederick was the ER doctor that treated Charlie. Dr. Frederick quickly realized Charlie had life-threatening injuries, and after a CT scan revealed bleeding in Charlie's abdomen, Dr. Frederick had Charlie flown to Kosair Children's Hospital[3] in Louisville (Kosair Hospital).

Dr. Melissa Currie, a Child Abuse Specialist and Medical Director in Chief of the Division of Child Maltreatment at the University of Louisville, testified regarding Charlie's injuries. Charlie had bruises on his face, on the front of his body from his neck to his genitals, and up and down his back. He did not have a normal level of awareness and had to be given fluids and blood to keep his blood levels up. A CT scan conducted at Kosair Hospital showed

---

[2] Charges were also filed against Samantha due to her conduct in this case. She testified that she did not realize the extent of Charlie's injuries at that time.

[3] Now Norton Children's Hospital.

that Charlie's pancreas was broken into two pieces, and that he also had a serious injury to his duodenum.[4]

Charlie was immediately taken to surgery. During surgery they found that Charlie had about 10 ounces of blood in his abdomen, which Dr. Currie testified was a lot for a baby his size. The surgeon had to remove the portion of his pancreas that was separated. Charlie's duodenum also had to be removed because its tissue was dying due to lack of blood flow. There were several tears in Charlie's mesentery[5] that also had to be repaired.

After surgery, Charlie's organs were so swollen that not all of his organs would go back in his abdomen. They therefore had to use a "silo" device for three days to house his organs outside of his body until they could safely be put back in his abdomen. After they closed his stomach, they conducted an x-ray which revealed Charlie had a broken tibia.[6] An MRI showed he had a vertebral compression fracture, meaning that one of the bodies of his vertebra was crushed.[7] Charlie was hospitalized for twelve days, eight of which were in the intensive care unit. He had a breathing tube and was placed on a ventilator. Dr. Currie testified that Charlie's injuries were consistent with an intrusion injury: a stomp, kick, or punch to his stomach. Based on the number of bruises, which were described as "innumerable," he was struck multiple times. Although Charlie has thankfully, if not miraculously, recovered from his injuries, his survival at that time was "not a given" according to Dr. Currie.

---

[4] The first section of the small intestine located directly in front of the pancreas.

[5] The organ that carries blood vessels to the intestines.

[6] Shin bone.

[7] This injury could not be dated.

During the trial Breazeale's defense suggested that Samantha caused Charlie's injuries after Breazeale left the home the morning of the fifteenth. Alternatively, the defense asserted that Breazeale inflicted Charlie's injuries unintentionally; that the injuries occurred when Breazeale patted Charlie on the back throughout the day so that he would not choke on his own vomit.

Breazeale was convicted of first-degree assault and first-degree criminal abuse. He now appeals his resulting thirty-year sentence to this Court.

## II.   ANALYSIS

Breazeale asserts several alleged errors to this Court. First, that his convictions for first-degree assault and first-degree criminal abuse violated his rights against being subjected to double jeopardy. Second, that the jury instruction on first-degree criminal abuse violated his right to a unanimous verdict. Third, that the trial court failed to instruct the jury on the "use of force by a person with the responsibility for care, discipline, or safety of others" (justifiable force). Fourth, that the trial court erred by allowing prior bad acts evidence. Finally, he alleges that the trial court erred by admitting two photographs.

## A. BREAZEALE'S CONVICTIONS DID NOT VIOLATE HIS RIGHTS AGAINST DOUBLE JEOPARDY

Breazeale's first argument is that his convictions for both first-degree assault and first-degree criminal abuse violated his rights against double jeopardy.[8] Breazeale concedes he failed to preserve this issue, but requests we review it for palpable error in accordance with RCr[9] 10.26:

> A palpable error which affects the substantial rights of
> a party may be considered by the court on motion for a

---

[8] *See* U.S. Const. amend. V and KY Const. §13.

[9] Kentucky Rules of Criminal Procedure.

> new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

An error made by a trial court that violates a defendant's rights against double jeopardy is considered *per se* manifest injustice, and therefore mandates reversal.[10]

The law of this Commonwealth regarding what constitutes double jeopardy is well-established. Kentucky follows the *Blockburger*[11] test to determine whether a defendant's rights against being subjected to double jeopardy are violated when that defendant is convicted for more than one offense arising from the same course of conduct. Specifically, our appellate courts ask whether a defendant's conviction for each offense "[required] proof of an additional fact which the other [did] not."[12] Accordingly, if "the exact same facts could prove the commission of two separate offenses, then the double jeopardy clause mandates that while a defendant may be prosecuted under both offenses, he may be convicted under only one of the statutes."[13]

In this case, the jury was instructed on both intentional and wanton first-degree assault.[14] Breazeale was ultimately convicted of intentional first-degree assault. The instructions for that charge stated:

> You will find the Defendant Nathaniel L. Breazeale guilty of First Degree Assault under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

---

[10] *See, e.g., Cardine v. Commonwealth*, 283 S.W.3d 641, 652 (Ky. 2009).

[11] *Blockburger v. United States*, 284 U.S. 299 (1932).

[12] *Commonwealth v. Burge*, 947 S.W.2d 805, 809 (Ky. 1996).

[13] *Clark v. Commonwealth*, 267 S.W.3d 668, 675 (Ky. 2008).

[14] *See* Kentucky Revised Statutes (KRS) 508.010(1)(a) and KRS 508.010(1)(b), respectively.

A. That in this county on or about March 14, 2017, and before the finding of the Indictment herein, he caused a serious physical injury to [Charlie] by punching, stomping or kicking him: AND

B. That in doing so:

(1)(a) The Defendant intended to cause serious physical injury to [Charlie]; AND

(b) The Defendant's hands or feet were a dangerous instrument as defined under Instruction 5[.][15]

The jury instruction for first-degree criminal abuse directed:

You will find the Defendant Nathaniel L. Breazeale guilty of First Degree Criminal Abuse under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about March 14, 2017, and before the finding of the Indictment herein, he intentionally abused [Charlie];

B. That he thereby caused a serious physical injury to [Charlie]; AND

C. That [Charlie] was at that time twelve years of age or less.

Therefore, in order for Breazeale to be convicted of first-degree assault the jury had to find that he intentionally inflicted serious physical injury upon Charlie with a dangerous instrument. In contrast, the first-degree criminal abuse instruction required the jury to find that Breazeale intentionally abused Charlie thereby causing serious physical injury, and Charlie was twelve years

---

[15] Instruction 5 defined "dangerous instrument" as "any instrument, including parts of the human body when a serious physical injury is a direct result of the use of that part of the human body, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury."

of age or less at the time of the abuse. Convictions under each of these instructions clearly required proof that the other did not. The first-degree assault instruction required a finding that Breazeale used a dangerous instrument to cause serious physical injury; the criminal abuse instruction required no such finding. And, the criminal abuse statute required a finding that the victim was twelve years of age or less when the abuse occurred; the first-degree assault statute does not have a victim age requirement.

We therefore hold Breazeale's rights against double jeopardy were not violated by his convictions for intentional first-degree assault and first-degree criminal abuse.[16] No palpable error occurred.

## B. BREAZEALE'S RIGHT TO A UNANIMOUS VERDICT WAS NOT VIOLATED

Breazeale next argues that his right to a unanimous verdict, as established in *Johnson v. Commonwealth*,[17] was violated by the first-degree criminal abuse jury instruction. Specifically, that the instruction does not specify the conduct that constituted "abuse."

Breazeale concedes that this issue is unpreserved and requests palpable error review, while the Commonwealth contends that Breazeale invited this alleged error by tendering an instruction that was substantially similar to the

---

[16] *See also Thompson v. Commonwealth*, 2017-SC-000169-MR, 2018 WL 2979952, at *3 (Ky. June 14, 2018) (holding defendant's convictions for first-degree assault and first-degree criminal abuse did not violate double jeopardy because each conviction required a finding the other did not), and *Beasley v. Commonwealth*, 2001-SC-000539-MR, 2003 WL 22974888, at *7 (Ky. Dec. 18, 2003) (holding, although not raised, the defendant's convictions for first-degree assault and first-degree criminal abuse would not violate double jeopardy because each conviction required a finding the other did not).

[17] 405 S.W.3d 439, 449 (Ky. 2013) (holding "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict.").

instruction ultimately given.[18] While we otherwise agree with the Commonwealth's argument, we hold that no unanimous verdict error occurred in accordance with *Cox v. Commonwealth.*[19]

In *Cox*, the defendant was convicted of murdering his four-month-old son.[20] The evidence presented at trial suggested that the defendant either shook or struck the child, or both, resulting in the child's death.[21] The jury instructions provided:

> You will find the Defendant guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That...the Defendant, by hitting, shaking or both, killed [the child]; AND
>
> B. That in so doing:
>
> (1) He caused the death of [the child] intentionally[.][22]

The defendant argued that this instruction violated his right to a unanimous verdict because it "failed to require all twelve members of the jury to identify the specific physical act by [the defendant] that caused [the child's] death."[23]

This Court disagreed, noting that the instruction at issue was a combination instruction, i.e. one that "permit[s] a conviction of the same

---

[18] *See Thornton v. Commonwealth*, 421 S.W.3d 372, 376 (Ky. 2013) (holding that the appellant invited any alleged jury instruction error by "proposing an instruction that contains the very defect he now opposes.").

[19] 553 S.W.3d 808 (Ky. 2018).

[20] *Id.* at 810.

[21] *Id.*

[22] *Id.* at 811.

[23] *Id.*

offense under either of multiple alternative theories."[24] And, that "[a] 'combination' instruction permitting a conviction of the same offense under either of multiple alternative theories does not deprive a defendant of his right to a unanimous verdict, so long as there is evidence to support a conviction under either theory."[25] This Court ultimately held that the defendant's right to a unanimous verdict was not violated because

> [a] conviction for murder, according to the statute, does not require the fact-finder to determine the precise physical act of [the defendant] that was the actual cause of [the child's] death. All that must be shown, to satisfy the element of causation under the statute, is that the defendant did something to cause the death of the victim...The dispute as to the specific physical act that [the defendant] performed to cause the death of the of his son is "a disagreement about means" that "[does not matter]" because "all 12 jurors unanimously concluded that the [Commonwealth] had proved the necessary related element, namely, that "[the defendant] caused [the child's] death...Because the jury instructions forced the jury to unanimous agreement that [the defendant] caused [the child's] death, regardless of the specific means, no unanimity error occurred because of the inclusion of the phrase "hitting, shaking, or both."[26]

In this case, Breazeale argues against the first-degree criminal abuse instruction, which directed:

> You will find the Defendant Nathaniel L. Breazeale guilty of First Degree Criminal Abuse under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about March 14, 2017, and before the finding of the Indictment herein, he intentionally abused [Charlie];

---

[24] *Id.* at 812.

[25] *Id.*

[26] *Id.* at 813.

B. That he thereby caused a serious physical injury to [Charlie]; AND

C. That [Charlie] was at that time twelve years of age or less.

Breazeale asserts that this instruction violated his right to a unanimous verdict because it does not specify what conduct constituted intentional abuse. He argues for example that, based on Dr. Currie's testimony that Charlie's injuries were consistent with a stomp, kick, or punch to his stomach, some jurors could have found he abused Charlie by punching him, while others could have found he injured Charlie by stomping on him.

But, as in *Cox*, Breazeale's argument is at its core a "disagreement about means." In order to satisfy the abuse element of the criminal abuse instruction all twelve jurors had to find that Breazeale intentionally committed some kind of violent act against Charlie.[27] But the jury was not required to find what that specific act was. Therefore, because there was sufficient evidence to support a finding under each of the alternate theories, i.e. stomping, kicking, or punching, no unanimous verdict error occurred.

## C. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY FAILING TO INSTRUCT THE JURY ON JUSTIFIABLE FORCE

Breazeale further contends that the trial court erred by failing to instruct the jury on justifiable force under KRS 503.110.[28] This Court reviews a trial court's ruling regarding jury instructions for abuse of discretion.[29] A trial court

---

[27] *See* KRS 508.090.

[28] This alleged error was properly preserved by Breazeale's tender of an instruction on justifiable force. RCr 9.54.

[29] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[30]

Breazeale argues, and is correct, that all criminal defendants have a due process right to present a defense, including jury instructions that give effect to a defendant's theory of the case.[31] It is precisely because of this due process right that trial courts have a duty to instruct the jury on the whole law of the case.[32] However, that duty "does not mandate the trial court place before the jury speculative theories merely because the testimony includes some basis for the speculation."[33] Breazeale requested an instruction on justifiable force, an affirmative defense. Therefore, in order to be entitled to that instruction, Breazeale had to present "some evidence justifying a reasonable inference" that the evidence warranted that instruction.[34]

The justifiable force statute, KRS 503.110, provides:

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant is a parent, guardian, or other person entrusted with the care and supervision of a minor or an incompetent person or when the defendant is a teacher or other person entrusted with the care and supervision of a minor, for a special purpose, and:
>
>> (a) The defendant believes that the force used is necessary to promote the welfare of a minor or mentally disabled person or, if the defendant's responsibility for the minor or mentally disabled person is for a special purpose, to further that special purpose or maintain reasonable discipline in a school, class, or other group; **and**

---

[30] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[31] *See, e.g., Webb v. Commonwealth*, 904 S.W.2d 226, 228 (Ky. 1995).

[32] RCr 9.54(1).

[33] *Lackey v. Commonwealth*, 468 S.W.3d 348, 355 (Ky. 2015).

[34] *See Luna v. Commonwealth*, 460 S.W.3d 851, 882 (Ky. 2015).

**(b) The force that is used is not designed to cause or known to create a substantial risk of causing death, serious physical injury, disfigurement, extreme pain, or extreme mental distress.**[35]

Part of Breazeale's defense was that any injury he caused to Charlie occurred when, throughout the day, he hit Charlie on the back to dislodge vomit he was choking on. He presented no evidence to support that doing so could cause the injuries Charlie sustained.

In contrast, in addition to evidence of Charlie's extensive, potentially fatal injuries discussed in the "factual background" section of this Opinion, Drs. Frederich and Currie both testified that Charlie's injuries were not consistent with accidental injury. Further, Dr. Currie attested that part of her job is to investigate suspicious injuries to children and determine whether the injuries are the result of child abuse. She testified that in her expert opinion, not only were Charlie's injuries not consistent with accidental injury, but they were in fact "diagnostic of inflicted child abuse." She explained that "diagnostic" means the highest level of certainty that child abuse was committed; it means she is sure that there is no other reasonable explanation. The compression fracture to Charlie's vertebra and his abdominal injuries in particular were the result of "a lot of violent force." Further, she said his injuries were more severe than those typically sustained when a child is ejected from a vehicle during a car accident.

Consideration of the foregoing simply does not allow a reasonable inference that the force used by Breazeale on Charlie was not "designed to cause or known to create a substantial risk of causing death, serious physical

---

[35] (emphasis added).

injury, disfigurement, extreme pain, or extreme mental distress." Charlie's injuries simply could not have been the result of the force Breazeale claimed to use to prevent Charlie from aspirating his own vomit. Accordingly, we hold that the trial court did not abuse its discretion in denying Breazeale an instruction on justifiable force.

## D. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING EVIDENCE OF BREAZEALE'S PRIOR BAD ACTS

Breazeale next argues that the trial court erred by allowing testimony regarding two separate incidents, both of which he asserts constituted prior bad acts not otherwise admissible under KRE[36] 404. We will address each in turn.

### i. The January Incident

Breazeale argues that it was error to admit evidence that concerned Charlie allegedly being injured by Breazeale roughly two months before the offense in this case.[37] We review a trial court's ruling on the admission of evidence for abuse of discretion.[38] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[39]

Samantha testified that from the end of December 2016 until mid-February 2017 Breazeale was unemployed and would babysit Charlie for her during the day while she was at work. On January 4, 2017, Breazeale brought Charlie to Samantha's workplace to show her a bruise on Charlie's face.

---

[36] Kentucky Rules of Evidence.

[37] This alleged error was properly preserved by the defense's pre-trial objection to the evidence being introduced. RCr 9.22.

[38] *Holt v. Commonwealth*, 250 S.W.3d 647, 652 (Ky. 2008).

[39] *English*, 993 S.W.2d at 945.

Breazeale said Charlie hit his head on the ceiling fan, but his stories were inconsistent as to exactly how he hit his head.[40] After this incident, Samantha and her mother put what Samantha called a "safety plan" in place: Samantha allowed Breazeale to continue babysitting Charlie, but Samantha's mother would check Charlie for bruises every day after work. This safety plan continued until Breazeale got a job and Samantha's sister began babysitting. Child protective services were never involved.

Breazeale contends that the trial court abused its discretion by allowing this evidence because it violates KRE 404(a)'s prohibition against the admission of a defendant's prior bad act to prove conformity therewith. He further asserts that the evidence was not relevant for any purpose other than showing his criminal disposition and had little probative value, and therefore violated KRE 403 as well. We disagree.

In the trial court's pre-trial order allowing the admission of this evidence the trial court found that the proffered testimony was relevant to proving Breazeale's intent and the absence of accident. It also found that the evidence was sufficiently probative and was not unduly prejudicial.

As previously stated, the Commonwealth cannot introduce evidence of a defendant's prior bad acts solely to prove conformity therewith.[41] However, there are a number of exceptions to this rule that permit the Commonwealth to introduce such evidence for other purposes. Two of those exceptions are provided in KRE 404(b)(1):

---

[40] Samantha stated that Breazeale told her he "aggressively picked [Charlie] up off the bed," and he hit his head on the ceiling fan. Breazeale would later tell investigating officers in this case that he "playfully threw Charlie up" and he accidentally hit the ceiling fan.

[41] KRE 404(a).

(b)Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as...intent...or absence of mistake or accident[.]

Here, the trial court found the evidence at issue was admissible to show that Breazeale intended to inflict Charlie's injuries, and/or that what happened to Charlie was not an accident. Both the January incident and the offense in this case occurred while Charlie was in the sole care of Breazeale. In both instances Charlie sustained bruises to his face. The incidents occurred within two months of one another. And in both instances, Breazeale claimed he did not intentionally hurt Charlie. We therefore hold the trial court did not abuse its discretion in finding that this evidence was an exception to the rule prohibiting prior bad acts evidence.

But our analysis does not end there. We must next address whether the trial court erred by finding the evidence was admissible under a KRE 403 balancing test. In other words, whether the evidence's probative value was substantially outweighed by its risk of potential undue prejudice.

Again, this evidence was admitted to suggest Breazeale's intent and that Charlie's injuries were not accidental. Part of Breazeale's defense was that if he did hurt Charlie it was accidental, and that he did not intend to hurt him. Therefore, evidence of the prior incident was highly probative to a key issue the jury was tasked with deciding: whether Breazeale intentionally hurt Charlie.

Next we ask whether the evidence's high probative value is substantially outweighed by potential undue prejudice. Evidence that is unduly prejudicial is that which "appeals to the jury's sympathies, arouses its sense of horror,

provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case."[42] Here, the essence of the testimony was that Charlie got bruises on his head while in Breazeale's care and Samantha and her mother believed Breazeale may have purposely hurt Charlie. In addition, a picture of Charlie from that day was entered into evidence. It shows at least four bruises on the right side of Charlie's face that are relatively minor.

Obviously, any allegation that a defendant has harmed a child will have some prejudicial effect. But based on the foregoing we cannot hold that the trial court abused its discretion by finding that the high probative value of this evidence was substantially outweighed by its risk of undue prejudice. Further, the jury was properly admonished that they were to consider the evidence, if at all, as evidence of Breazeale's intent, or his lack of mistake or accident. Juries are presumed to follow a trial court's admonitions, and Breazeale has offered no evidence to rebut that presumption.[43] This is particularly true when considering the other overwhelming evidence of his guilt.

## ii.   Evidence of Healing Injuries

Breazeale also argues that the trial court erred by allowing Drs. Frederick and Currie to testify that Charlie had old, healing rib fractures. From review of the record, it is clear that the defense itself solicited this information as part of its trial strategy.

The Commonwealth called Dr. Frederick as a witness prior to calling Dr. Currie. On direct examination, the Commonwealth did not ask Dr. Frederick

---

[42] *Richmond v. Commonwealth*, 534 S.W.3d 228, 232 (Ky. 2017).

[43] *See Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

any questions regarding Charlie having old, healing fractures. The defense, on the other hand, asked the following during Dr. Frederick's cross-examination:

> **Defense:** The other radiological reports are from other areas of [Charlie's] body: his head, his limbs, things of that sort. And you did not observe in those any broken bones?
>
> **Dr. Frederick:** There were old, healing fractures.
>
> **Defense:** You're not able to date those fractures, are you?
>
> **Dr. Frederick:** No.
>
> **Defense:** And you can't say who actually caused these injuries can you?
>
> **Dr. Frederick:** No.

Then, during Dr. Currie's subsequent direct examination, she referenced Charlie's healing rib fractures at least three times throughout her testimony. The defense did not object to her statements or ask for an admonition. Then, during Dr. Currie's cross-examination, the defense asked her how old the healing fractures were. She said they were likely at least two weeks old.

The defense is now objecting to the very evidence that it solicited. "In the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel[.]"[44] Accordingly, we hold that the trial court did not err by allowing evidence that Charlie had old, healing rib fractures into evidence.

---

[44] *Salisbury v. Commonwealth*, 556 S.W.2d 922, 927 (Ky. App. 1977).

## E. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING PHOTOGRAPHIC EVIDENCE

Breazeale's final argument is that the trial court erred by allowing two photographs into evidence.[45] We review a trial court's ruling on the admission of evidence for abuse of discretion.[46] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[47] We will address the admission of each photograph in turn.

### i. The January Incident

As previously noted, a photograph of Charlie was entered from the day he sustained bruises to his face while in Breazeale's care two months prior to the offense in this case. The defense objected and asserted that it was not relative to the crime Breazeale was being tried for. The trial court overruled the objection and admonished the jury that the photograph could only be considered as evidence of Breazeale's intent, or his lack of mistake or accident.

For the same reasons provided in the previous section of this opinion, this evidence was relevant and highly probative. Further, its probative value was not substantially outweighed by its risk of potential undue prejudice. Therefore, the trial court did not abuse its discretion by allowing it into evidence.

### ii. The Silo Photograph

Breazeale also argues the trial court erred by allowing a photograph of Charlie after his first abdomen surgery into evidence. The photograph depicts Charlie, post-surgery, with the silo placed on his abdomen, temporarily

---

[45] This issue was preserved regarding both photographs by contemporaneous objection to their admission. RCr 9.22.

[46] *Holt*, 250 S.W.3d at 652.

[47] *English*, 993 S.W.2d at 945.

housing Charlie's organs on the outside of his body. Breazeale argues that this photograph was not relevant and should not have been admitted due to its gruesomeness under *Hall v. Commonwealth.*[48]

In *Hall,* this Court reinforced the rule that all evidence, including gruesome photographs, must first pass a KRE 403 balancing test.[49] As stated, this means that the evidence's probative value is not substantially outweighed by its risk of potential prejudice.

Dr. Currie testified that Charlie's organs were so swollen following his surgery that his treating physicians were not able to put them back into his abdominal cavity. This prompted their need to use the silo to house his organs until the swelling subsided. The fact that Charlie's organs became so swollen demonstrated how much force was used against him when his injuries were inflicted. Breazeale's assertion was that he accidently inflicted Charlie's injuries, but it is likely impossible that the kind of injuries Charlie sustained were the result of accidental force as Charlie described.

Further, in order to carry its burden of proof on both the first-degree assault charge and the first-degree criminal abuse charge, the Commonwealth had to prove that Charlie sustained a serious physical injury.[50] Serious physical injury means "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."[51] And, for children under the age of twelve, serious physical

---

[48] 468 S.W.3d 814 (Ky. 2015).

[49] *Id.* at 823.

[50] *See* KRS 508.010(1)(a) and KRS 508.100(1)(a).

[51] KRS 500.080(15).

injury includes abdominal injuries that indicate internal organ damage,[52] and any injury requiring surgery.[53] Based on the foregoing, the photograph of Charlie and with the post-surgical silo had a high probative value.

As for the risk of undue prejudice, Breazeale asserts that the photograph's gruesomeness renders it so under *Hall, supra.* It would be disingenuous of this Court to claim that the photograph is not uncomfortable to view. However, it is clearly distinguishable from the photographic evidence at issue in *Hall.*

To begin, in *Hall,* twenty-eight offending photographs were at issue, many of which were needlessly cumulative.[54] Here only one photograph that showed the use of the silo was admitted. In addition, the photographs in *Hall* depicted the scene of a double murder wherein the perpetrator used a high caliber rifle at close range, along with the victims' autopsy photographs.[55] The photographs in *Hall* were so jarring that this Court described them as being in the "upper echelon of gruesome photos."[56] Here, the complained of picture shows a living child, post-surgery, who ultimately survived. Accordingly, the singular silo photograph did not reach to the level of gruesomeness of the photographs in *Hall.*

We therefore hold that the trial court did not abuse its discretion by admitting the post-surgical photograph of Charlie and the attached silo.

---

[52] KRS 500.080(15)(m).

[53] KRS 500.080(15)(n).

[54] *Hall,* 468 S.W.3d at 820.

[55] *Id.* at 820-22.

[56] *Id.* at 826.

## III. CONCLUSION

Finding no reversible error, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General